

ORIGINAL

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA,
*ex rel* JAMES R. BRICKMAN and
GREENLIGHT CAPITAL, INC.,

Relators,

v.

BUSINESS LOAN EXPRESS LLC,
ALLIED CAPITAL CORP.;
ROBERT TANNENHAUSER;
MICHAEL COHEN; JENNIFER
GOLDSTEIN; LOUIS HAFKIN;
MATTHEW McGEE; JOAN
SWEENEY; Does 1-100,

Defendants.

Civil Action File

No.: **1 :04-CV-3789**

Case No.:
**FILED IN CAMERA AND
UNDER
SEAL
COMPLAINT FOR
DAMAGES
UNDER THE FEDERAL
FALSE
CLAIMS ACT
Jury Trial Demanded**

## FACTS COMMON TO ALL CAUSES OF ACTION

### Jurisdiction and Venue

1. This is an action to recover damages and civil penalties on behalf of the

United States of America under the False Claims Act, 31 U.S.C. § 3729 et

seq., arising out of false claims presented by Defendants under the Small

Business Act, Public Law 85-536, 15 U.S.C. §§ 631 et seq.

2. This Court has jurisdiction over this action pursuant to 28 U.S.C.§

1331 and 31 U.S.C. § 3729 et seq.

3. Venue is proper in the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) and (c). Claims set forth in the Complaint arose in said District. In addition, Section 3729(a) of the False Claims Act provides that "[a]ny action under section 3730 may be brought in any judicial district in which any Defendant may be found to reside, or transact business, or in any district in which any proscribed act has occurred." Defendant Business Loan Express LLC (hereinafter "BLX") has an office in and transacts business within the judicial District of the Northern District of Georgia.

4. Under the False Claims Act, this complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on the Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the complaint and the material evidence and information.

## Parties to the Action

5. Qui tam relator James R. Brickman is and at all times material herein was a citizen of the United States of America residing in Dallas, Texas.

6. Qui tam relator Greenlight Capital, Inc. (hereinafter "Greenlight") is

2

and at all times material herein was a corporation doing business in the State

of New York, is a resident of the State of New York, and brings this action

on behalf of the United States of America. Greenlight is an investment

management firm founded in 1996, and manages a series of value-oriented

alternative investment funds specializing in publicly-traded U.S. securities.

In the course of its business Greenlight has developed information about the

activities of Defendants which have worked a fraud upon the United States.

7. Relators have met repeatedly with Office of the Inspector General in

the Small Business Administration (hereinafter "SBA"), the FBI, and the

SEC to alert them to the fraud described herein. Relators have furnished to

the Attorney General of the United States and to the United States Attorney

for the Northern District of Georgia, simultaneously with or prior to the

filing of this complaint, a statement of all material evidence and information

related to the complaint. This disclosure statement supports the existence of

false claims made and caused to be made by the Defendants.

8. Defendant BLX is and at all times material was a corporation doing

business in the State of Georgia, approving business loans guaranteed by the

SBA. BLX was created on January 1, 2001 when Allied Capital Corp.

(hereinafter "Allied") bought a small business lender, Business Loan

3

Financial, Inc. (hereinafter "BLC") and merged it with its own SBA lending arm -- Allied Capital Express (hereinafter "ACE") . Although Allied sometimes claims that BLX is merely an "investment", it has admitted publicly that BLX is actually a subsidiary of Allied. According to SEC filings, Allied owns 94.9% of BLX. The remaining shares are reportedly held by executives from BLC who now run BLX. Allied recently disclosed that it reorganized BLX into a limited liability company.

9. BLX is located at 645 Madison Avenue, New York, New York, 10022. It also has offices in Atlanta, Georgia located at 3675 Cloudland Drive, N.W., Atlanta, Georgia 30327. BLX operates 47 regional offices across the United States, and claims that its $2.4 billion loan portfolio now encompasses over 3,300 small business borrowers.

10. Defendant Allied is and at all times material was a corporation doing business in the State of Georgia and owns nearly 95% of BLX. Allied is a private equity investing firm located at 1919 Pennsylvania Avenue, Washington, D.C. 20006.

11. Relators are informed and believe and based thereon allege that each of the specifically identified individual Defendants, Robert Tannenhauser, Michael Cohen, Jennifer Goldstein, Louis Hafkin, Matthew

4

McGee, and Joan Sweeney were, at all times material hereto, officers, managers, directors, or senior executives of Defendant BLX, and as such were either on BLX' loan committee, or in other ways exercised significant influence or control over which applications for SBA loans were approved by BLX.

12. Each of the Defendants designated as a Doe is an entity the form and identity of which is unknown to Relators at this time, but is involved in submitting or causing the submission of false claims and records by one or more of the named Defendants herein. Relators will seek leave to amend the complaint to set forth their true identities once they become known.

13. At all times herein mentioned, each of the Defendants was an agent, servant or employee of each of the remaining Defendants, and was at all times acting within the purpose or scope of said agency or employment, and was acting with the express or implied knowledge, permission or consent of the remaining Defendants, and each of them.

## Legal and Regulatory Framework

14. In the 1950's Congress created the SBA to provide technical and management assistance to qualified small businesses. (See 15 U.S.C. §636(a).) The SBA Section 7(a) Loan Guaranty Program authorized the

5

SBA to lend money to eligible, credit-worthy businesses through loan guarantees to participating lenders. Section 7(a) loans are the most basic and most frequently used loans within the SBA business loan program. Its name comes from section 7(a) of the Small Business Act, which authorizes the SBA to provide business loans to small American businesses. All 7(a) loans are provided by lenders who are called "participants" because they participate with the SBA in the 7(a) program. There are bank and non-bank lenders such as Defendant BLX herein which participate with the SBA in the 7(a) program making loans under SBA guidelines. All 7(a) loans which the SBA guarantees must meet 7(a) underwriting criteria. Under the program, the borrower receives a loan from its lender with a 7(a) structure and the lender gets an SBA guaranty on a significant portion of the loan.

15. Section 7(a) loans are available only on a guaranty basis. BLX's obligations under the 7(a) program to the SBA emanate from (1) the parties' loan guaranty agreement itself; (2) the loan authorization issued by the SBA and (3) federal regulations implementing the 7(a) program. The terms of the loan guaranty agreement obligate BLX to close and disburse all SBA-guaranteed loans in accordance with the terms and conditions of the applicable loan authorization, and to take all actions, consistent with prudent

6

closing practices, necessary to protect the interests of the SBA. The guaranty

agreement also obligates BLX to follow the loan servicing standards

employed by prudent lenders generally, and it incorporates, by reference, the

SBA's rules and regulations. The federal regulations release the SBA

from liability on a loan guaranty unless the lender has substantially complied

with all of the provisions of the SBA's regulations and the loan guaranty

agreement. 13 C.F.R. §120.202-5. This means they are provided by lenders

who choose to structure their own loans by the SBA's requirements and who

apply and receive a guaranty from the SBA on a portion of those loans. The

SBA does not fully guaranty 7(a) loans. The lender and the SBA share the

risk that a borrower will not be able to repay the loan in full. The guaranty is

only against payment default. It does not cover imprudent decisions by the

lender or misrepresentations by the borrower. Under the guaranty concept,

commercial lenders make and administer the loans. A business borrower

applies to a lender for financing. The lender decides if it will make the loan

internally or if the application has some weaknesses, which in the lender's

opinion will require an SBA guaranty, if the loan is to be made. The

guaranty which the SBA provides is only available to the lender. It assures

the lender that in the event the borrower does not repay its obligations and a

payment default occurs, the SBA will reimburse the lender for part of its loss, up to the percentage of the SBA's guaranty, provided however that the lender has complied with the underwriting requirements. This provides substantial incentive for a lender such as BLX to misrepresent compliance with the servicing and underwriting requirements.

16. Originally, all loans guaranteed by the SBA were reviewed and approved by the SBA itself. In 1983 Congress authorized the Preferred Lenders Program (hereinafter referred to as "PLP") to provide a carefully selected group of lenders the authority to make loans on behalf of the SBA. Under PLP, the SBA delegates loan approval, closing, and most servicing and liquidation authority and responsibility to these selected lenders. This means that although the loan applications are privately reviewed and processed, the SBA would ultimately be liable for up to 85 percent of the loan amount if the borrower defaults, as long as the lender met SBA guaranty requirements.

17. The SBA calls companies to which it has delegated this power "Preferred Lenders". The SBA has promulgated standard operating procedures ("SOPs") which address its obligation to repurchase a guaranteed loan and have the force and effect of law. Preferred Lenders enter into a loan guaranty agreement with the SBA which requires the lender to evaluate,

8

originate, and service SBA guaranteed loans to SBA's specifications. SOP 50 10(4), Ch. 3, ¶7.a. and in 13 CFR §120 et seq. According to SOP 50 10(4),¶7 and 13 CFR §120.452(a), the "SBA's business loan eligibility, credit policy, and procedures apply to PLP loans." Defendant BLX is a Preferred Lender, which gives it underwriting authority without having to obtain approval from the SBA for each loan.

18. Preferred Lenders enter into a Loan Guaranty Agreement with the SBA which requires the lender to issue, close, and disburse guaranteed loans subject to SBA rules and regulations. Preferred Lenders are required to fully protect the interests of the SBA. The lenders must send the SBA a quarterly report which contains current and accurate information about loan delinquencies. The SBA is not obligated to purchase the guaranteed percentage of the outstanding balance of a loan if the SBA determines that the lender's failure to provide timely and accurate status information caused any substantial harm to the government.

19. PLP lenders specifically certify:

(a) the loan was closed pursuant to the SBA's loan authorization;

(b) the date of the note;

(c) the maturity date;

9

(d) the date of the first and final disbursement;

(e) the total amount of the disbursement;

(f) that the guaranty fee was mailed to the SBA;

(g) that all required compensation agreements are attached to the
lender certification;

(h) the signer of the certification is authorized to do so; and

(i) the applicant is a small business according to the standards of 13
CFR Part 121, the loan's proceeds will be used for an eligible
purpose, and the owners and managers of the applicant business
are of good character.

20. BLX, as a Preferred Lender, "is responsible for all PLP decisions
regarding eligibility (including size) and creditworthiness." 13 CFR
§120.452(c). A "PLP Lender must analyze a PLP applicant's eligibility in
the same way that SBA analyzes eligibility for a regular 7(a) loan applicant."
SOP 50 10(4), Ch. 3, ¶8.a. The Preferred Lender must prepare a "credit
memorandum in the loan file. The credit memo must show that the lender
gathered enough information to make an informed analysis about repayment
ability for the loan." SOP 50 10(4), Ch. 3, ¶8.b. The credit memo must
accurately and adequately discuss capitalization, repayment ability,

management ability, collateral, and credit history. Federal regulations require BLX to prove its "substantial compliance" with the terms of the loan guaranty agreement. This requirement of "substantial compliance" under §120.202-5 (now replaced by § 120.524) is characterized as providing the SBA with a potential affirmative defense to liability on its loan guaranty, or as setting forth a condition precedent to the SBA's guaranty obligation. 21. Using an SBA-backed loan to refinance or pay off an existing SBA guaranteed loan is prohibited. "A PLP loan may not be made if there is any question of the possible violation of any of SBA's ethical requirements, or if there are any real or apparent conflicts of interest." SOP 50 10(4), Ch. 3, ¶7.a.(4)(f). Also, a "PLP loan may not be used to finance more than 90 percent of the actual cost of any real estate being acquired or of the capital needs for a new business." SOP 50 10(4), Ch. 3, ¶7.a.(4)(d). Piggyback loans (a combination of two loans where a non-SBA guaranteed loan has a lien position senior to that of the PLP loan), although permitted, may only be made under carefully circumscribed conditions. For example, a Preferred Lender which itself holds a superior lien on the property may not then make an SBA-guaranteed loan. (Subp. D, Ch. 3, ¶ 7), nor may a Preferred Lender

inflate or fail to verify the value of the property and thus issue a piggyback

loan which, in combination with another loan, exceeds 90% of that value.

22. "PLP Lenders must be very capable at processing, servicing and

liquidating SBA-guaranteed loans. The lender does a thorough and complete

credit analysis of the applicant, and establishes that the loan is of such value

as to reasonably assure repayment." The Preferred Lender is also responsible

for confirming that all PLP loan closing decisions are correct, and that it has

complied with all requirements of law and SBA regulations. (SOP 50 10(4)

Ch. 3 ,¶8 and 13 CFR §120.452(c)). The SBA has no obligation to purchase

its share of the guaranteed loans unless the Lender has substantially

complied with all 13 C.F.R. §120.202-5, which governs the SBA's

obligation to honor its loan guarantees and provides: "SBA shall be released

from obligation to purchase its share of the guaranteed loan unless the

Lender has substantially complied with all of the provisions of these

regulations, the Guaranty Agreement and the Loan Authorization." Pertinent

SBA regulations explicitly impose the burden of proof of substantial

compliance upon BLX.

23. The loan application must disclose any amounts paid to representatives, including loan brokers, "that helped the applicant obtain the loan, describing the services performed, and disclosing the amount of each fee paid or to be paid by the applicant to the Agent in conjunction with the performance of those services." SOP 50 10(4), Subpart A-Ch. 6-¶12; 13 CFR §120.195; see also SBA Form 159, "Compensation Agreement."

24. When servicing SBA-guaranteed loans, "a PLP lender can take all routine servicing actions except any that would convey a preference on itself." SOP 50 10(4), Subpart D-Ch. 3,¶9; see also 13 CFR §120.453. The Preferred Lender must use "generally accepted commercial banking standards employed by prudent lenders [and] must liquidate any defaulted SBA guaranteed loan in its portfolio unless SBA advises in writing that SBA will liquidate the loan." 13 CFR §120.453.

## Factual Allegations

25. At all times material hereto, Defendant BLX and its predecessors, BLC and ACE, were approved as Preferred Lenders by the SBA.

26. BLX systematically engages in loan origination fraud, committing the SBA to guaranty loans which, under SBA's policies, or even prudent lending

13

practices, should never have been made. These problems exist not only in Georgia, but also in Michigan, New York, South Carolina, Virginia and, Relators are informed and believe, everywhere else that BLX does business. In fact both BLX and its predecessors, BLC and ACE have default rates nearly twice the national average.

27. Because BLX recognizes its revenue and receives its compensation based on the volume of loans at the time of origination, its incentives are to flood the system with as many loans as possible, without regard to their quality. BLX undermined its underwriting by, *inter alia*, hiring underwriters with no or minimal lending experience. BLX practices also have the effect of weak oversight on the approval of the loans and weak scrutiny of the loan applications. Loan applications are held up until the end of the month or quarter, and rushed through the loan committee with no time to check facts. This is in keeping with BLX as a production office with the orientation of getting applications in, out, and funded as quickly as possible.

28. This hurried approach to loan underwriting establishes the precondition for BLX's disregard of the SBA's PLP requirements. It is also in perfect alignment with the motives of at least one key individual Defendant.

14

Relators are informed and believe and based thereon allege that Defendant

Robert Tannenhauser personally participates in a title company which

operates out of BLX's corporate offices, and that he benefits from each loan

approved by retaining some or all of the $3000 per search that goes to that

title company. With BLX approving some 600 loans per year, this title

company generated approximately $1.8 million in fees.

29. As of the summer of 2001, about 20% of BLX's loan portfolio was in

default. Relators are informed and believe and based thereon allege that its

predecessor, BLC, had a similarly high rate of defaults and delinquencies.

Many of these delinquencies occurred very early in the loan, suggesting that

BLX did not follow SBA rules regarding eligibility, verification of credit

history, capitalization adequacy and loan repayment ability. In 2001, these

delinquencies exceeded $135 million, the majority of which was guaranteed

by the SBA.

30. BLX's internal documents showing this delinquency rate are borne

out by static pool analysis of BLX's loans, which one of the Relators

commissioned from BancLab, LLC (hereinafter "BancLab"). BancLab

tracks and analyzes data in the financial services industry. It analyzed small

business loan risks based on data from over 400,000 small business loans

issued in a three-year period. BancLab compared BLX and its predecessors

with both a national pool of loans from all SBA lenders during the period

from 1998 through 2001, and with a "peer pool" of loans with approximately

the same maturity, size, region, and industry classification as BLX's.

BancLab reported that BLX's default rate was over twice that for the peer

pool, and nearly three times higher than the national pool.

31. Relators believe that the higher default rate reflects the overall impact

of Allied and BLX's aggressive refusal to comply with the SBA's

underwriting requirements. Given that BLX is the second largest small

business lender in the country, with over $2.4 billion in its current loan

portfolio, the coming losses will be sobering -- all the more so since the SBA

guarantees the vast majority of them. Based on the BancLab analysis

Relators believe that the excess loss to the SBA arising from Defendants'

false claims will eventually exceed $100 million

32. Buyers of BLX's SBA loans became reluctant to pay the premiums

typically paid for the government-guaranteed loans because of the higher

default risk. Loan buyers have commented that the level of appraisal work

and due diligence performed by BLX was well below industry standards as

commonly practiced in the marketplace.

## DEFENDANTS' METHODS
## OF COMMITTING LOAN FRAUD

33. Defendants' cavalier approach to issuing and processing government

guaranteed loans takes several forms:

-- Illegally preparing loan applications for borrowers;

-- Failure to independently verify details in loan application

information;

-- Failure to verify, or inflating the value of collateral;

-- Failure to verify borrower's tax returns;

-- Failure to ensure that the borrower is injecting any, or enough of its own

capital into the enterprise;

-- Facilitating piggyback loans that do not meet SBA restrictions;

-- Fostering borrowers' subdivisions of collateralized property as a way to

create a disguised second tier loan;

-- Creating sham appraisals, or using appraisals of extremely doubtful

validity;

-- Refinancing defaulted loans to cover up losses;

-- Undisclosed flips (concealed simultaneous purchase and resale of a

business to falsely inflate its value as collateral);

– Undisclosed compensation and funding of closings without bona fide transfer of ownership;

– Self-dealing;

– Using loan documents with forged signatures;

– A reliance on loan brokers with suspicious ties to regional BLX managers to drive new loan originations. Often these broker-driven loans are of poor credit quality, and seem underwritten merely to pad the pockets of the brokers and allow BLX managers to report high origination volumes;

– Active concealment (by the brokers and middlemen) of actual operational results;

– The employment of a convicted felon as a senior manager in one of BLX's largest offices despite the fact that the SEC barred him from affiliating with an investment company;

– Fraudulent and reckless servicing of the loans; and

– Procuring loan guaranty payments from the SBA by falsely claiming that BLX has originated and serviced its guaranteed loan in a commercially reasonable manner and otherwise has complied with the terms of the parties' agreement and the regulations.

34. Although the preceding litany focused on loan origination fraud,

Defendants' fraud permeated the entire loan administration process. When a borrower defaults and collection enforcement is necessary, the Preferred Lender is required to liquidate all of the borrower's business assets before calling on the SBA to honor its guarantee. Defendants abused the liquidation process to manipulate the timing of when losses would be reported to the SBA, thus minimizing regulatory oversight so that they could maintain their eligibility to participate in the PLP.

35. Relators are also informed and believe and based thereon allege that Defendants illegally concealed loan delinquency information from the SBA, and that Defendants had economic ties to loan brokers which gave the brokers confidence that virtually any one and any property would be accepted as a borrower, and which gave Defendants a strong financial incentive to turn a blind eye to obviously flawed loan applications.

## BAD LOANS IN GEORGIA

36. BLX's egregious behavior to defraud the SBA (and the U.S. Government) may best be exemplified by a series of loans which enriched a borrower at the taxpayer's expense: Jagernauth Stugrimo bought neighboring motels on the Gordon Highway in Augusta, Georgia, in 1999.

19

He paid $1,785,000 for the two motels and then received SBA loans from BLC for a total of $1,890,000, or $105,000 more than the purchase price. 37. One of Stugrimo's companies, AJP, Inc., bought Howard Johnson Express Inn on June 16, 1999 for $900,000, and received an SBA-guarantied loan from BLC for $1,000,000. Stugrimo was the Vice President and CEO of AJP, Inc, the company buying the Howard Johnson Express Inn. Six months later, another Stugrimo Company, Nischal, Inc., bought the Travel Lodge Augusta across the street from the Howard Johnson Express Inn for $885,000, received a BLC procured loan for $8900,000,

38. BLX failed to properly assess the adequacy of the borrower's equity put into the two deals, inflated the value of the collateral, and issued two transactions which each have exceeded the 90% limit on the total purchase price.

39. Both loans were in delinquency in barely a year, and remained in default until Stugrimo walked away from both motels late in 2002, sources familiar with the loans said. The motels were subsequently looted of much of their furnishings, according to industry sources.

40. In December 2002 and February 2003, at least a year after the loans

were in default, BLX foreclosed on the properties, auctioning them off to its own BLC Real Estate Corp. for a loss of at least $497,000 plus unpaid interest of at least $100,000. Relators expect that the loss to the SBA approached $500,000.

41. Another striking example of the Defendants' indifference to SBA requirements may be seen in its loan to H&J Enterprises in Rabun, Georgia. H&J defaulted on a $1.4 million loan which was secured by property worth only $44,774. BLC's issuance of this loan without any demonstrable verification of the collateral's value is yet another example of the Defendants' disregard of SBA requirements.

42. In 2001, BLX's suspicious delinquent loans in the Northern District of Georgia included:

| Name | Loan Number | Payments Made Before Delinquency |
|---|---|---|
| Tampa Bay Resorts | 1-0-081398 | 3 |
| Sika Brothers | 1-0-092297B | 3 |
| DK Group | 1-0--063099B | 2 |
| Little Learners Acad. | 1-0-063000 | 1 |
| Thrill Sports Ent. | 1-0-071300 | 1 |
| Giant Suds, Inc. | 1-0-720015820 | 1 |

21

Saba's Quick Stop 1-0-072001470     1

Hari Aum LLC     1-0-061499ALL     1

## BAD LOANS IN MICHIGAN

43. BLX-tied loan fraud against the SBA is widespread in the gas
station/convenience store sector in Michigan. In numerous instances, the gas
station frauds involve members of a specific community, whereby suspect
individuals act as loan brokers to obtain SBA financing for others in that
same community. In two instances Relators found that a person named on
loan documents as a borrower claimed to have no knowledge of the business
he was purportedly running and no knowledge of the loans approved in his
name by BLX.

44. BLX kept track of the status of loan payments and collection efforts in
an internal document called the "Delinquency Report". BLX's August 2001
Delinquency Report showed a series of suspicious loans made by BLX's
Detroit office. It lists 30 delinquent gas station/convenience store loans,
eleven of which are concentrated in the Detroit area. Those eleven totaled
$11.2 million.

45. Many of these loans are based on inflated property valuations or fake

sales between related parties to artificially raise the value of the property. For example, Abdulla Al'Jufairi was a loan broker in multiple BLX gas station loans. At least two of these loans went into delinquency shortly after being issued. The delinquent loans could only have been underwritten by violating SBA's requirements. Relators are also informed and believe, and thereon allege that the loans evidence links between BLX personnel and Al'Jufairi.

46. In one example, Al'Jufairi incorporated Ryan Petro-Mart LLC on March 29, 2001. Although Al'Jufairi incorporated the company, BLX listed the borrower as one Amer Farran, who purportedly received a loan for $1,350,000. The 2001 municipal tax assessment of the Ryan Petro-Mart property lists its market value as $442,816, almost $900,000 below the loan issued on the property by BLX. BLX could not have approved this loan without completely disregarding the principles of prudent lending and due diligence in the application process.

47. The loan was delinquent several months after being issued and it appears that only one partial payment was made.

48. UCC registration of the loan was not filed against the property until

March of 2002, meaning that BLX apparently had no perfected collateral at all on the loan for almost a year after it was issued and had already gone into delinquency. Loan and UCC filings are usually made at the same time. Although there was no SBA rule requiring a UCC filing at the same time the loan is issued, this scarcely qualifies as the "generally accepted commercial banking standards employed by prudent lenders" which the SBA requires of Preferred Lenders.

49. Relators found that Al'Jufairi is also linked to the Farmington Petro-Mart which obtained a $1,350,000 loan from BLX. Although the listed borrower is again Amer Farran, BLX's Delinquency Report lists Al'Jufairi's telephone number (248-346-4881) as the borrower contact person for the Farmington loan. When interviewed Farran said he was an engineer with the Ford Motor Company and appeared to know nothing about the two gas stations or his listing as the borrower from BLX. Farran nonetheless admitted knowing Al'Jufairi – and responded to questions about the Farmington loan by saying, "I guess I have a call to make to Abdulla, don't I?"

50. Relators also found that Al'Jufairi is listed as the incorporator of

24

another BLX borrower, Golfside Petro-Mart LLC which received $1,275,000 from BLX. Again, the loan is delinquent, and again, Al'Jufairi's telephone number is listed as the gas station business number in the Delinquency Report. Al'Jufairi also runs a company – Van Buren Oil – that supplied gasoline to the gas stations he helped to obtain BLX loans for, Relators have learned.

51. Al'Jufairi also acted as loan broker for yet another Detroit area gas station - Jefferson Fuel Mart - which obtained a $1,350,000 loan from BLX and went into default shortly after obtaining the loan.

52. The pattern of loan origination fraud in the Detroit area is quite widespread. There are eight other BLX gas station/convenience store loans in the Delinquency Report that have similar inflated property valuations and loan payment problems. It is not clear from the Delinquency Report whether Al'Jufairi was the loan broker in these deals. Relators are informed and believe and based thereon allege that Al'Jufairi has reportedly fled the country, according to the State Department.

53. There was little or no review by BLX staff in Detroit of the material in the loan applications submitted by Al'Jufairi. Again, this suggests that BLX

regularly flaunted SBA rules in originating loans to the gas
station/convenience store sector in Detroit.

54. Relators are informed and believe and based thereon allege that there
is a connection between Al'Jufairi and Pat Harrington who runs BLX's
Detroit office. BLX's Delinquency Report contains an activity log
demonstrating collection efforts for most of the loans. The log for
Farmington Petro-Mart shows that unlike all other loans, BLX began its
collection effort by directly (and repeatedly) contacting Harrington about the
loan.

55. BLX's apparently warm relationship with Al'Jufairi is not the only
problem BLX poses for the SBA in Detroit. BLX has turned a blind eye to
improper inflation of property values, and has refused to take basic
precautions to verify and inventory the value of securing collateral.
Although SOP O 50 51 2, Ch. 8, ¶8 requires lenders to conduct site visits
and conduct meaningful inspections of collateral, BLX' lending practices are
either conducted in the dark, or are, in fact, collusive.

56. Another example of flagrant disregard of SBA requirements can be
seen in the windfall to N&J Gas, which borrowed $760,000 on January 2,
2003, for the full purchase price of commercial lots located at 19420

26

Woodward Avenue in the Detroit suburb of Highland Park. Just three years before, one Baia Hamze had purchased the lots for $180,000, or just 25% of the selling price to N&J Gas.

57. N&J Gas never paid the property taxes on the lots, which were quitclaimed twice in three weeks in the spring of 2004. The second of those quitclaims was signed over to one Imad Soueid, who lives at the same address as Hamex Oil Company, owned by Baia Hamze. This entire fraud could have been prevented through the simple expedient of verifying the property's value – the very thing the SBA requires. In 2001, BLX's delinquent gas station loans included at least the following:

| Name | Loan Number | Payments Made Before Turning Delinquent |
|------|-------------|------------------------------------------|
| DFP Gas, Inc. | 1-0-720015090 | 3 |
| Batoul Petro, Inc | 1-0-720015510 | 2 |
| Deluxe Market, Inc. | 1-0-720013940 | 5 |
| BnD MinMart, Inc. | 1-0-092900ALL | 1 |
| Yasmin Rajabali | 1-0-062101D | 1 |

## BAD LOANS IN NEW YORK

58. In April 2000, BLC made five loans totaling $4.8 million. Although

27

ostensibly unrelated, all five were actually tied to The King Service, a local

fuel company in upstate New York. The loans appear to have been set up in

a way that circumvented the SBA loan cap of $2,000,000 per borrower,

since the contact number for all of them is the same – The King Service's

corporate number. All of these loans went into default or delinquency within

a year after being issued, and remain in default. The loans in question are:

| Name | Loan Number | Payments Made Before Turning Delinquent |
|------|-------------|------------------------------------------|
| Congress Street 2nd Avenue Waterford | 1-0-033100 | 1 |
| Mill Street Tamarac | 1-0-033100B | 1 |
| The King Service, Inc. | 1-0-033100D | 1 |
| Exit 8 LLC | 1-0-033100E | 1 |
| Quaker & Dix, Northern Drive LLC | 1-0-033100F | 1 |

59. In Long Island, the Defendants lent over a million dollars to the White

Sun Cleaners, a laundry connected to a Mob-connected figure, Anthony

Cardillo. Cardillo had previously been sued by the Department of Labor for

his organized crime connections. He was ultimately removed as a trustee of

Teamsters Local 363 and ordered, along with others, to repay some $1.4

million that had been looted from the Local's treasury. Cardillo's property

had also been cited for environmental problems by the EPA on multiple

occasions in 2000 and 2001. Yet BLX purchased a prime based note secured

by this EPA-sanctioned property, allowing a Cardillo-associated business

organization to make a $250,000 profit. That same day, BLX issued an

SBA-guaranteed loan to the White Sun Cleaners, the business that was on

the property. The borrower filed bankruptcy and the loan has been assigned

to the SBA for liquidation.

## BAD LOANS IN VIRGINIA
## UNDER THE DIRECTION OF A CONVICTED FELON

60. BLX's Richmond, Virginia office originates about 15% of BLX's new

loans. This ambitious undertaking is led by R. Matthew McGee. McGee was

hired by BLC shortly after his release from prison on a securities fraud

conviction. McGee is also barred by the SEC from associating with any

broker, dealer, municipal securities dealer, investment adviser or investment

company.

61. When BLC got the SBA to approve McGee's hiring, it kept from the

SBA news of McGee's debarment by the SEC. Even so, the SBA approved

the hiring only on condition that McGee would not be involved in the

financial affairs of BLC or have credit approval or responsibility.

Nonetheless, McGee often personally presents loans to the BLX loan

29

approval committee. McGee works with a number of loan brokers across the
country, and works especially closely with one Kevin J. Friedrich. Friedrich,
too, was once banned from the investment business for five years in 1990.
62. BLC and BLX violated SBA's policies and procedures by failing to
independently verify loan application details, including the assessment and
valuation of collateral. They also violated SBA's prohibition against a PLP
loan financing more than 90% of the actual cost of real estate being
acquired.

## THE ALTER EGO LIABILITY OF ALLIED FOR
## THE ACTS OF BLX

63. Relators are informed and believe and based thereon allege that at all
times material herein Allied has controlled and operated BLX as the alter
ego of Allied, for the benefit of Allied. In so doing it has disregarded the
existence of BLX as a separate and distinct corporate entity. Moreover,
Allied has done all of this with the intention to defraud the United States and
other creditors.

64. One of Allied's very reasons for purchasing the BLX predecessor,
BLC, in the first place, was to gain control of an entity which it could burden
with the liability for the bad small business loans previously made by Allied.
By purchasing BLC's assets and unloading onto it Allied's own liabilities,

30

Allied thus began a campaign of shifting debts and contingent liabilities from Allied to BLC.

65. The diversion of assets continues to this day. As recently as September 30, 2004, the ending date for Allied's most recent 10Q filing with the Securities and Exchange Commission, BLX contributed \$35.1 million of Allied's income (over one sixth of its dividends.) for the first nine months of calendar year 2004.

66. Allied's characterization of BLX as "an investment", and Allied's manipulation of the assets and liabilities of the BLX for its own benefit at the expense of BLX is further evidence of Allied's operation of BLX as a mere alter ego of Allied.

67. Allied has seen to it that the key members of its Board of Directors also sit on BLX's Board, thus controlling BLX and ensuring that its operations redound to Allied's benefit. The saddling of BLX with liability for Allied's bad loans are one of the products of the failure to maintain an arm's length relationship between the two entities.

68. Allowing Allied to maintain the fiction that BLX is a separate and independent entity, and not Allied's alter ego, would frustrate the purposes of the False Claims Act as well as the legislative purposes behind the

31

restitutionary provisions of the 7(a) program. Allowing Allied to handsomely profit from BLX's submission of false and fraudulent claims and then to evade liability for this despite such profit, would cause a deep injustice to be visited upon the United States.

## FIRST CAUSE OF ACTION FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729

69. Relators repeat and replead and hereby incorporate each and every one of the allegations set forth in paragraphs 1-68, inclusive, as though fully set forth herein.

70. In agreeing to participate in the SBA programs, particularly the PLP, the Defendants were responsible for ensuring that loans they originated, serviced and liquidated complied with SBA's rules and regulations. Defendants entered into an agreement with the SBA to issue loans in accordance with SBA's rules and regulations, to engage in prudent closing practices and to fully protect the interests of the lender and the SBA. Defendants' conduct, as described herein above, indicates that they did not originate, service or liquidate the loans according to SBA's rules and regulations. They did not close the loans in a prudent manner or

32

fully protect the interests of the SBA. They did not make accurate quarterly reports as required, nor did they liquidate defaulted SBA-guaranteed loans in their portfolio according to commercial banking standards employed by prudent lenders, also as required.

71. Defendants were responsible for ensuring that the loans issued were to be used for an eligible purpose. Defendants' conduct, as described herein above, indicates that they not ensure as such since the borrowers defaulted early on the loans, sometimes after making only one or a few payments. Defendants were responsible to ensure that compensation agreements, such as those for loan brokers, were attached to the lender certification submitted to SBA, or disclose compensation agreements, as required. Defendants did not do this, and at least in one circumstance personally benefited from such arrangements.

72. Defendants were responsible for determining a borrower's eligibility for SBA-guaranteed loans and creditworthiness. Defendants' conduct, as described herein above, indicates that they did not ensure as such since the borrowers defaulted early on the loans, sometimes after making only one or a few payments.

33

Defendants failed to accurately and adequately analyze borrowers'

capitalization, repayment ability, and collateral, among other things.

73. Defendants circumvented loan caps and limitations on multiple loans

to borrowers by ignoring the obvious evidence that borrowers were closely

tied and in some cases were one and the same.

74. As detailed hereinabove, Defendants' violations of the SBA's policies

and procedures show that they acted in reckless disregard of the loan

applications they submitted to the SBA for the SBA's guaranty.

75. As detailed hereinabove, Defendants' violations of the SBA's policies

and procedures show that they knowingly and willfully did not ascertain the

truth or falsity of the loan applications they submitted to the SBA for the

SBA's guaranty.

76. The claims submitted by Defendants for the SBA's guaranty were

improper, and hence the money to be paid for the guarantees on those loans

Defendants made would thus constitute false claims actionable under the

False Claims Act. 31 U.S.C. § 3729.

77. The United States was damaged as a result of the conduct described

above.

## SECOND CAUSE OF ACTION FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729

78. Relators repeat and replead and hereby incorporate each and every one of the allegations set forth in paragraphs 1-77, inclusive, as though fully set forth herein.

79. Defendants were legally required to make periodic reports to the SBA that correctly reflected current and accurate information about the status of loan delinquencies.

80. Relators are informed and believe and based thereon allege that the Defendants filed false reports with the SBA concealing the actual status of delinquent loans, and that this was done so that Defendants could maintain their eligibility to participate in the Preferred Lender Program.

81. These misrepresentations were material in that they had a natural tendency to influence the SBA to keep Defendants in the Preferred Lender Program. Had the truth been known, the SBA would have terminated Defendants' participation in this program, thus ending Defendants' ability to cause losses to the government.

82. The United States was damaged as a result of the conduct described above.

35

## THIRD CAUSE OF ACTION FOR CONSPIRACY TO VIOLATE THE FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(3)

83. Relators repeat and replead and hereby incorporate each and every one of the allegations set forth in paragraphs 1-77, inclusive, as though fully set forth herein.

84. Relators are informed and believe and based thereon allege that the Defendants and other as yet unnamed individuals acted in concert with one another to obligate the SBA to guaranty loans which did not meet SBA criteria by, *inter alia*, using lenders, bankers, brokers, middlemen, title and escrow agents and others, to circumvent SBA requirements regarding capital injections, to fund business transactions at inflated prices, to use fraudulent financial information, to conceal compensation and related party transactions, and to make other false representations.

85. The United States was damaged as a result of the conduct described above.

## PRAYER FOR RELIEF

### For each and every cause of action:

1. Judgment against the Defendants in an amount equal to three times the damages sustained by the United States as a result of Defendants' conduct;

36

2. A civil penalty of not less than five thousand five hundred dollars

($5,500.00) and not more than eleven thousand dollars ($11,000.00) for each

violation of 31 U.S.C. § 3729;

3. That Relators, as Qui Tam plaintiffs, be awarded the maximum

amount allowed pursuant to 31 U.S.C. §3730(d) and/or any other applicable

provision of law;

4. Attorney's fees and costs according to proof.

Respectfully Submitted,
Dated:  /2-28-C4
LAW OFFICES OF MARK ALLEN KLEIMAN

Mark Allen Kleiman
California Bar No. 115919
12400 Wilshire Boulevard
Suite Four Hundred
Los Angeles, CA 90025
Phone: (310) 442-4820
Fax: (310) 442-4830
Attorney for Relator Greenlight Capital, Inc.

LAW OFFICES OF JOHN CARNEY

John H. Carney
Texas Bar No. 0382200
One Meadows Building
6700 N. Central Expressway
Dallas, Texas 75206
Phone: (214) 368-8300

Fax: (214) 363-9979
Attorney for Relator James R. Brickman

HILL & BEASLEY, LLP

Janet E. Hill
Georgia Bar # 354230
1160 S. Milledge Ave., Suite 140
Athens, GA 30605
Phone: 706-353-7272
Fax: 706-549-8446
Local Counsel for Relators Greenlight Capital, Inc. & James R. Brickman

COMPLAINT FOR DAMAGES UNDER THE
FEDERAL FALSE CLAIMS ACT
**DEMAND FOR JURY TRIAL**
Relators request a jury trial.


Dated: _12/28/04_
LAW OFFICES OF MARK ALLEN KLEIMAN


_Mark Allen Kleiman_ by Jakli w/ permission

Mark Allen Kleiman
California Bar No. 115919
12400 Wilshire Boulevard
Suite Four Hundred
Los Angeles, CA 90025
Phone: (310) 442-4820
Fax: (310) 442-4830
Attorney for Relator Greenlight Capital, Inc.

LAW OFFICES OF JOHN CARNEY


_John H. Carney_ by Jakli w/ permission

John H. Carney
Texas Bar No. 0382200
One Meadows Building
6700 N. Central Expressway
Dallas, Texas 75206
Phone: (214) 368-8300
Fax: (214) 363-9979
Attorney for Relator James R. Brickman

HILL & BEASLEY, LLP


Janet E. Hill

Georgia Bar # 354230
1160 S. Milledge Ave., Suite 140
Athens, GA 30605
Phone: 706-353-7272
Fax: 706-549-8446
Local Counsel for Relators Greenlight Capital, Inc. & James R. Brickman